# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NORTH CAROLINA
# WESTERN DIVISION

## No. 5:10-CV-00512-D

MARY KEARNEY TAYLOR,     )
                                    )

      Plaintiff,            )
                                    )

v.                              )
                                    )      **MEMORANDUM &**
                                    )      **RECOMMENDATION**

MICHAEL J. ASTRUE,     )
Commissioner of Social     )
Security,                 )
                                    )

      Defendant.         )
_____  )

      This matter is before the Court upon cross motions for judgment on the pleadings filed by Plaintiff and Defendant. (DE-27, DE-29). In accordance with 28 U.S.C. § 636(b)(1), this matter has been referred to the undersigned for the entry of a memorandum and recommendation. For the following reasons, it is RECOMMENDED that Plaintiff's motion for judgment on the pleadings (DE-27) be DENIED, Defendant's motion for judgment on the pleadings (DE-29) be GRANTED, and that the final decision by Defendant be AFFIRMED.

## I.     STATEMENT OF THE CASE

      Plaintiff applied for a period of disability and disability insurance benefits ("DIB") on April 2, 2008, alleging she had been unable to work since March 31, 2007. (Tr. 130-131). Her claim was denied after initial review and again upon reconsideration. (Tr. 64). An Administrative Law Judge ("ALJ") held a hearing on December 2, 2009, at which a vocational expert ("VE") testified. (Tr. 26-48). At the hearing, Plaintiff amended her claim to request a

1

closed period of disability. Specifically, Plaintiff requested a period of disability beginning September 1, 2007 and ending December 1, 2008. (Tr. 29). In a decision dated January 28, 2010, the ALJ found Plaintiff not disabled from March 31, 2007, the original onset date, through the date of the decision. (Tr. 8-21). Plaintiff requested review of the ALJ's decision by the Social Security Administration's Office of Disability Adjudication and Review ("Appeals Council") and submitted additional evidence in support of her claim. (Tr. 5; Tr. 233-236). Plaintiff again amended her claim for benefits back to her original onset date of March 31, 2007, and also sought ongoing benefits. (Tr. 233). On September 17, 2010, the Appeals Council denied the request for review, rendering the ALJ's determination as Defendant's final decision. (Tr. 1-6). Plaintiff filed the instant action on November 15, 2010. (DE-1).

## II.    DISCUSSION

### A.  Standard of Review

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.

"Under the Social Security Act, [the court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere

scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368

F.2d 640, 642 (4th Cir. 1966). "In reviewing for substantial evidence, [the court should not]

undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its]

judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited

to determining whether Defendant's finding that Plaintiff was not disabled is "supported by

substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453,

1456 (4th Cir.1990).

The Social Security Administration has promulgated the following regulations establishing

a sequential evaluation process to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant
> engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If
> not, the analysis continues to determine whether, based upon the medical
> evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c).
> If the claimed impairment is sufficiently severe, the third step considers
> whether the claimant has an impairment that equals or exceeds in severity
> one or more of the impairments listed in Appendix I of the regulations. 20
> C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the
> claimant is disabled. If not, the next inquiry considers if the impairment
> prevents the claimant from returning to past work. 20 C.F.R. §
> 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative,
> the final consideration looks to whether the impairment precludes the
> claimant from performing other work. 20 C.F.R. § 404.1520(f).

Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

## B. ALJ's Findings

Here, the ALJ employed the sequential evaluation. First, the ALJ found that Plaintiff did

not engage in substantial gainful activity from September 1, 2007 through December 1, 2008, the

amended closed period. (Tr. 13). At step two, the ALJ found that Plaintiff suffered from the

following severe impairments: (1) lumbar degenerative disc disease and (2) residuals from carpal

tunnel syndrome surgery. (Id.). However, the ALJ determined that during the closed period

3

these impairments or combination of impairments were not severe enough to meet or medically equal any listed impairment. (Tr. 13). Based on the evidence of record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") during the closed period to lift and carry up to ten pounds occasionally, sit for at least six hours during a typical eight-hour workday, and stand and walk for up to two hours during a full eight-hour workday, as required for sedentary work, with the proviso that she could frequently use her hands but not continuously perform fine manipulative tasks, due to her history of carpal tunnel syndrome. (Tr. 14).

The ALJ then proceeded with step four of her analysis and determined that, during the closed period from September 1, 2007 through December 1, 2008, Plaintiff was capable of performing her past relevant work as a cashier and office manager. This work did not require the performance of work-related activities precluded by her residual functional capacity. (Tr. 20). Based on these findings, the ALJ determined that Plaintiff was not under a disability from March 31, 2007, the original alleged onset date, through the date of her decision. (Tr. 21). The ALJ's findings were based upon the following substantial evidence in the record.

### C. **Plaintiff's Testimony and Other Evidence of Record**

Plaintiff was fifty-six years old at the time of her hearing. (Tr. 30). She testified she had completed the eighth grade. (*Id.*). Plaintiff worked at a Safeway grocery store from 1977 until 1994. (Tr. 34). While working at Safeway, Plaintiff injured her back loading gallons of milk onto a cart. (Tr. 34; Tr. 418). She eventually received workers' compensation benefits for her injury. (Tr. 34). When she recovered, Plaintiff found work at a cash checking business, where she operated the cash register and kept records. (Tr. 30-31). Plaintiff alternated sitting and standing in her position with the cash checking business. (Tr. 31). Plaintiff next worked at the United States Department of the Treasury in Washington, D.C. (Tr. 32). Plaintiff described her

4

tasks there as "[s]elling permits, titles, tags" and "waiting on customers, processing them, and making deposits, running the office, balancing the safe, and the last two years I was in management, so I had two other people under me." (Tr. 32). Plaintiff left her job at the Treasury Department to move to North Carolina in 2005 when her husband retired. (Tr. 32-33). After she moved, Plaintiff could not find a position offering part-time work. Plaintiff explained that when offered full-time employment, she declined because she "couldn't do it full-time." (Tr. 32). Plaintiff decided to stop looking for even part-time work because minor household chores, like cooking and cleaning, were becoming increasingly difficult and causing pain in her back and hands. (Tr. 33).

In August of 2007, Plaintiff's back pain progressively worsened, spreading down to her left buttock and leg. (Tr. 35). She attended nine physical therapy sessions and received three lumbar injections over the course of several months. (Tr. 35-36). Although the injections provided temporary relief, her pain always returned. (Tr. 35-36). Plaintiff testified that during this time period, she spent her time "laying around a lot, and taking medication, [and] going to doctors' visits." (Tr. 42). Her chores were "very, very limited because the pain was so severe." (*Id.*). Her medication made her sleepy. Eventually, her health care providers advised her that she was receiving too many steroid injections, at which point Plaintiff agreed to have back surgery. Following the surgery, Plaintiff developed foot drop in her left foot. (Tr. 37). Her left foot became "limp" and she wore a brace "for the whole summer." (*Id.*). She testified that her foot still "flops" "[a]ll the time." (*Id.*). Since Plaintiff's surgery in 2008, she has had no specific treatment for her back other than medication. (Tr. 38).

On a typical day, Plaintiff has difficulty cleaning and cooking because of muscle spasms in her back. (Tr. 38). Plaintiff also experiences residual pain in her hands from carpal tunnel

5

syndrome, for which she had surgery in 1991. (Tr. 39). The pain in her hands, back and legs prevent her from sleeping well at night. Plaintiff prefers to sleep in a sitting position and takes medication to help her sleep. She uses a heating pad in the evenings to help relieve the pain in her hands. Plaintiff enjoys watching television and reading. She visits friends and family and attends church. (Tr. 40). She also takes walks. She estimated that she can walk "close to a mile" and "feel okay" but if she stands for six or seven minutes, her back "freezes up." (Tr. 40).

Steven Carpenter, a vocational expert ("VE"), testified at Plaintiff's hearing. (Tr. 44-47). Mr. Carpenter discussed Plaintiff's past work using the *Dictionary of Occupational Titles*. Mr. Carpenter stated that an individual of advanced age, with a limited education and Plaintiff's work experience, who could lift and carry up to ten pounds occasionally, sit for six hours and stand and walk for up to two hours in an eight-hour workday, who could use her hands frequently but not continuously perform fine manipulative tasks, could perform Plaintiff's past relevant work as a cashier or office manager as those jobs are generally performed in the national economy. However, he noted, such an individual would not be able to perform the jobs as Plaintiff testified she actually performed them.

The medical evidence introduced in support of Plaintiff's claim is summarized in pertinent part as follows:

### **Medical Evidence Prior to December 1, 2008**

On September 10, 2007, Plaintiff visited her treating physician, Dr. Firas Chazli, complaining of stiffness and pain in her lower back over the previous three weeks. The pain radiated to her left buttock and worsened with rest but improved with activity. (Tr. 309). She reported increased stiffness in her back when sitting more than ten minutes. Upon examination, Dr. Chazli found no lumbar or sacral spine tenderness and no limitation to the range of motion of

6

her spine, but he noted mild local spasm of the paravertebral muscles. (*Id.*). Plaintiff's gait was normal. Dr. Chazli diagnosed lumbago, muscle spasms, and diabetes. He added Skelaxin to Plaintiff's other medications and recommended stretching exercises, local heat, and physical therapy. (*Id.*).

An MRI of Plaintiff's lumbar spine performed on October 1, 2007 revealed "[c]entral and left-sided L4-5 greater than L3-4 disc herniations with lumbar spinal stenosis, particularly at L4-5." (Tr. 261). At an October 18, 2007 visit to Dr. Chazli, Plaintiff reported her back pain had improved with physical therapy, but that she continued to have problems while sitting in the car. (Tr. 265). Dr. Chazli noted that "[c]linically, [Plaintiff] has no evidence of nerve impingement." (*Id.*). He discussed with Plaintiff the potential side effects of epidural steroid injections and noted her pain was stable.

Dr. Chazli referred Plaintiff to Dr. Jentry Naylor at Goldsboro Pain Medicine for further treatment. (Tr. 293-94). At an October 22, 2007 visit, Plaintiff told Dr. Naylor that she had periodic flare-ups of back pain following an injury. She reported the current flare-up had lasted for two months and although physical therapy had helped, the pain kept returning. Skelaxin and Celebrex, the medications prescribed for Plaintiff, provided no significant relief and made her sleepy. (Tr. 293). She described her lower back pain "as dull, sometimes sharp" and her leg pain as "weak and numbness." (*Id.*). The pain worsened whenever she drove, rode, or stood longer than fifteen minutes. Plaintiff rated her pain level "anywhere from between a 4 to 6 on any given day." (Tr. 293). Upon examination, Plaintiff's reflexes were diminished in her lower extremities, and her strength was "4 out [of] 5 on all levels, upper and lower and bilaterally." (Tr. 294). Dr. Naylor assessed Plaintiff as having degenerative disc disease and "herniated L4-L5, L3-L4 to the left causing some stenosis and back pain, left-sided sciatica." (*Id.*). He prescribed

7

Neurontin and Ultram, encouraged Plaintiff to continue her physical therapy home exercise program and use her treadmill, and scheduled her for a lumbar epidural injection. (*Id.*).

Plaintiff visited Pitt County Memorial Hospital for her first epidural injection on November 15, 2007. (Tr. 304). At that time, she reported being unable to lie on her right side at night because of left leg radicular symptoms and could only stand for ten minutes before having to sit. Following the injection, Plaintiff was discharged without evidence of complication. (Tr. 305). At a follow-up appointment on December 13, 2007, Plaintiff reported that the injection helped. (Tr. 302). Plaintiff received a second steroid injection on January 4, 2008. (Tr. 300). At that time, Plaintiff stated she had "very good pain relief with [the] injection." (*Id.*). Most of her leg felt better, except for a "small part in the left lateral calf and knee." (*Id.*). The numbness in her toes had also improved. At a visit to Dr. Chazli on February 4, 2008, Plaintiff told him that "her back pain [was] doing a lot better after epidural steroid injections." (Tr. 308). Plaintiff "opted to hold on her third injection since she [was] doing a lot better." (*Id.*). She no longer had any numbness in her left foot.

Plaintiff had her third epidural steroid injection on February 20, 2008. (Tr. 299). The treating physician, Dr. Christopher Grubb, noted there had "been significant pain improvement since the last injection." (*Id.*). Dr. Grubb saw Plaintiff again on April 17, 2008. (Tr. 337). She reported that, while her pain relief following each injection was significant, it was not long-lasting. Dr. Grubb performed a "[l]eft L5 [t]ransforaminal [l]umbar [e]pidural [s]teroid [i]njection" and diagnosed lumbar degenerative disc disease, lumbar radiculopathy, and lumbago. (*Id.*). Dr. Grubb repeated the left L5 transforaminal injection on June 11, 2008. (Tr. 340).

Dr. Chazli referred Plaintiff to Dr. Keith A. Tucci, a neurological and spine specialist, for a consultation regarding the surgical options available for her herniated disc and pinched nerve.

8

(Tr. 465).   Dr. Tucci examined Plantiff on June 12, 2008 and informed her of the possible risks and benefits of surgery.   Plaintiff decided to go forward with surgery approximately two weeks later.   (Tr. 464).   Dr. Tucci ordered an updated MRI of Plaintiff's lumbar spine, which revealed a transitional lumbar configuration with partial sacralization at L5, evidence of a left-sided disc herniation at L4-5 with associated spinal stenosis, and moderate to severe disc degeneration seen at L3-4 and associated L3-4 small central disc protrusion.   (Tr. 462).   On July 9, 2008, Dr. Tucci performed a left L4 hemilaminectomy, L4-5 diskectomy, and nerve root decompression on Plaintiff.   (Tr. 455).   The surgery went well with no complications.   Plaintiff developed foot drop in her left foot, however.   (Tr. 447).   Plaintiff had periodic follow-up visits with Dr. Tucci over the following months.   (Tr. 445-48).   She also visited Dr. Chazli, who noted she was "doing very well from her low back standpoint."   (Tr. 437).   Plaintiff denied having "any further pain or discomfort."   (*Id.*).   By December 1, 2008, Plaintiff's wound had healed well, her back discomfort had resolved, her radiculopathy was gone, and her strength in her foot was "75 to 80% better and getting better steadily."   (Tr. 444).   Dr. Tucci found that Plaintiff "look[ed] great" and changed her periodic follow-up appointments to an as-needed basis only.   (Tr. 444).

On May 16, 2008, Dr. Pamela Jessup, and on July 16, 2008, Dr. Robert Pyle, state agency medical consultants, reviewed Plaintiff's medical evidence for purposes of disability determination.   Both consultants believed Plaintiff had the residual functional capacity for medium work activity, except that she had limited handling ability because of her history of carpal tunnel syndrome.   (Tr. 323-330, 344-349).   These evaluations, however, predated Plaintiff's spinal surgery on July 9, 2008 and therefore did not encompass this evidence.

**Medical Evidence After December 1, 2008**

On January 25, 2009, Plaintiff visited Dr. Chazli complaining of left shoulder pain with

9

overhead activities and an inability to sleep on her left side because of the shoulder pain. (Tr. 441). Upon examination, Dr. Chazli noted limited motion of the left shoulder with forward flexion and internal rotation, and positive impingement signs. There was also weakness in the left foot dorsiflexion, but Plaintiff's gait was normal. Dr. Chazli diagnosed rotator cuff syndrome unspecified, diabetes, hypertension, and hyperlipidemia. He gave her an injection of Depomedrol, which Plaintiff tolerated well. Plaintiff was able to move her shoulder without discomfort shortly following the procedure. (Tr. 441).

At a follow-up visit with Dr. Chazli on May 28, 2009, Plaintiff reported continued pain in her left shoulder with certain movements, especially when she lifted weights. (Tr. 440). Plaintiff had mild stiffness across her lower back without radiculopathy symptoms. Dr. Chazli referred Plaintiff to an orthopedist for her shoulder pain. (*Id.*).

Plaintiff returned to Dr. Chazli on September 29, 2009, complaining of soreness and stiffness in her knees, hands, and lower back upon first rising from bed or whenever she rested. (Tr. 439). She reported taking ibuprofen as needed and denied any muscle soreness, weakness or fatigue. Upon examination, Dr. Chazli found "mild limitation in flexion of the LS spine" and "mild stiffness of her knuckles and knees, but no jointline tenderness or effusions." (*Id.*). Dr. Chazli diagnosed generalized osteoarthritis, diabetes, and hypertension. (*Id.*). Dr. Chazli suspected that Lipitor was a contributing factor in Plaintiff's joint problems and discontinued its use for four weeks in order to monitor Plaintiff's symptoms. ( *Id.*).

In a letter dated February 26, 2010, Dr. Chazli reported that Plaintiff had a history of type 2 diabetes that was adequately controlled, hyperlipidemia, a history of L3-4 and L4-5 spinal stenosis with left foot drop status-post surgery in July 2008, and a history of bilateral carpal tunnel surgery. (Tr. 526). She also had a history of left rotator cuff syndrome and a benign lipoma of her left

10

elbow. Dr. Chazli noted that Plaintiff was being evaluated by a rheumatologist for her generalized joint pain.

An MRI of Plaintiff's lumbar spine performed on March 25, 2010 showed an L4-5 left hemilaminectomy with progression of moderately severe effacement of the right subarticular recess with increased mass effect upon the L5 nerve root, enlargement of an L3-4 disc protrusion with mild displacement of nerve roots, and multilevel moderate to severe lumbar spondylosis and mild to moderate facet joint arthrosis. (Tr. 527-528).

Plaintiff submitted an undated letter from her chiropractor, Dr. Michael Hall, regarding her condition. (Tr. 529). Dr. Hall noted that Plaintiff originally presented to his office on April 23, 2010 with complaints of lower back pain radiating to the bilateral legs, with the left leg somewhat worse than the right. She described the pain as "a cramping, crawling feeling sometimes accompanied by pins and needles." (*Id.*). Plaintiff also had foot drop on the left "particularly when fatigued," which Plaintiff could minimize if she concentrated on her gait. Dr. Hall reported that he treated Plaintiff with nonsurgical spinal decompression, interferential EMS current, and cryotherapy with "good result to date." (*Id.*). Dr. Hall requested that Plaintiff be considered for long-term disability. (*Id.*).

## III.  ANALYSIS

Plaintiff argues the ALJ erred as a matter of law in failing to properly evaluate her RFC and that the Appeals Council failed to properly consider new and material evidence in her case. These arguments are addressed in turn.

### A.  The ALJ properly assessed Plaintiff's RFC

Plaintiff challenges the ALJ's determination regarding her residual functional capacity. The ALJ found that Plaintiff had the residual functional capacity to lift and carry up to ten pounds

11

occasionally, sit for at least six hours during an eight-hour workday, stand and walk up to two hours in an eight-hour workday, and could frequently use her hands although not continuously perform fine manipulation because of her history of carpal tunnel syndrome. (Tr. 14). The ALJ gave only "some weight" to the RFC evaluations performed by the state agency medical consultants because "their evaluations did not fully consider [Plaintiff's] symptoms or the fact that she underwent back surgery on July 9, 2008." (Tr. 20). The ALJ therefore rejected the consultants' determinations that Plaintiff was capable of performing medium-range work and found her capable of performing only sedentary work.

Plaintiff contends the medical record was deficient in that no treating physician offered an opinion as to her RFC, only non-examining state agency medical consultants. Because the ALJ gave only limited weight to the medical consultants' evaluations, Plaintiff argues the ALJ improperly based the RFC determination on her own "lay speculation" regarding Plaintiff's ability to perform a reduced range of sedentary work. However, the responsibility for assessing a claimant's RFC lies with the ALJ, *see* 20 C.F.R. § 404.1546(c), and thus the ALJ is not a "lay person" making this determination. Here, contrary to Plaintiff's assertions, the ALJ relied upon a well-developed medical record in making the residual functional capacity determination. The record contained substantial information, developed over the course of several years and based upon objective testing and Plaintiff's own reports, sufficient to render a determination as to the extent of her impairments. Importantly, an opinion on disability is not a medical opinion, *see* 20 C.F.R. § 404.1527(e)(1), but represents rather an opinion on an issue reserved to the Commissioner because it is an "administrative finding[ ] dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(e). Thus, "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that

12

[the Commissioner] will determine that [a claimant is] disabled." 20 C.F.R. § 404.1527(e)(1).

Notably, the ALJ did not find that Plaintiff was unimpaired but instead determined that she has significant restrictions. Plaintiff is limited to performing only sedentary work and cannot continuously perform fine manipulative tasks due to her history of carpal tunnel syndrome. This determination is supported by evidence of record. In the time period leading up to her spinal surgery, Plaintiff received physical therapy and epidural steroid injections. Plaintiff consistently told her physicians that the injections gave her significant pain relief. Because the pain relief was not long-lasting, however, Plaintiff opted to have surgery. Six weeks following her spinal surgery in 2008, Plaintiff's back pain had generally improved and her gait was stable, although she had developed foot drop. (Tr. 447). Two months following surgery, Dr. Tucci observed that Plaintiff could walk without any obvious foot drop. (Tr. 446). On December 1, 2008, Plaintiff told Dr. Tucci that her back discomfort had resolved and her radiculopathy was gone. Dr. Tucci observed that Plaintiff "looked great" and told her to return only on an as-needed basis. On the whole, the medical evidence indicates that despite having a back impairment, Plaintiff's pain was generally controlled with epidural injections and when she could no longer receive injections, the subsequent surgery provided pain relief. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986).

Plaintiff further contends that the ALJ erred in failing to fully credit her subjective allegations of disabling pain and functional limitations. The ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were "not persuasive" to the extent they contradicted her RFC. (Tr. 16). In support of her credibility finding, the ALJ noted the medical evidence generally showed no evidence of nerve impingement prior to

13

Plaintiff's surgery in July 2008.  As determined above, the ALJ's assessment is supported by evidence of record.  Inasmuch as Plaintiff asserts the ALJ should have afforded her statements greater credibility, it is not this Court's role to "undertake to re weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary."  Craig, 76 F.3d at 589.

**B.  The Appeals Council properly considered Plaintiff's additional evidence**

Plaintiff contends that the Appeals Council ("AC") failed to properly consider new and material evidence regarding her condition.  Specifically, Plaintiff contends that the AC failed to give sufficient weight to a March 25, 2010 MRI, as well as a report from her treating chiropractor, Dr. Hall.  Although the AC reviewed this evidence, it found that the MRI report and letter from Dr. Hall did "not provide a basis for changing the [ALJ's] decision."  (Tr. 2).  Plaintiff argues the evidence demonstrates that the July 2008 surgery did not resolve her back condition and therefore indicates she is disabled, contrary to the ALJ's finding.

Evidence submitted subsequent to an ALJ's final decision is relevant only to the extent that it pertains to the question of whether or not the claimant was disabled on or before the date of the hearing decision.  See 20 C.F.R. § 404.970(b); Wilkins v. Secretary, Dept. of Health and Human Services, 953 F.2d 93, 95-96 (4th Cir. 1991).  Here, the additional evidence submitted by Plaintiff does not show she was disabled prior to the January 28, 2010 decision of the ALJ.  As of the December 2, 2009 hearing, Plaintiff requested a closed period of disability ending December 1, 2008, when Dr. Tucci released her.  Plaintiff thereby essentially admitted that she was not disabled from December 1, 2008 through at least December 2, 2009—only two months before the ALJ decision.  Although Plaintiff agrees that she "believed she had improved," and thus amended her claim for a closed period, she now argues the AC "should have considered the fact that [she]

14

was never able to successfully return to work and that new MRI results and a medical source opinion [chiropractor Dr. Hall] verified that she had not medically improved." (DE-28, p.23). Plaintiff overstates the evidence. While the March 2010 MRI indicates involvement of the L5 nerve root, the MRI, standing alone, does not demonstrate Plaintiff's inability to work. An impairment is disabling only to the extent that it precludes a claimant from performing substantial gainful activity. *See* Craig , 76 F.3d at 589. Similarly, Dr. Hall's letter does not demonstrate that Plaintiff was disabled prior to the decision by the ALJ. As noted *supra*, although Dr. Hall urged that Plaintiff be considered for long-term disability, the issue of disability is an issue reserved to the Commissioner. Moreover, Dr. Hall stated he had been treating Plaintiff "with good result to date," which suggests that her impairments were reasonably under control. Finally, there is no evidence that Plaintiff has unsuccessfully attempted to return to work. At the hearing, she testified that she left her position at the Treasury Department when her husband retired, not because of any impairment. When she relocated to North Carolina, she declined an offer of full-time employment and could not find a part-time position. She eventually stopped looking for part-time employment. As such, Plaintiff's continued unemployment was not relevant to the consideration of whether she was disabled prior to the ALJ's determination. Because the additional evidence failed to show that Plaintiff was disabled on or before the date of the hearing decision, the AC did not err in denying review.

15

## IV.    CONCLUSION

For the reasons discussed above, it is RECOMMENDED that Plaintiff's motion for judgment on the pleadings (DE-27) be DENIED, that Defendant's motion for judgment on the pleadings (DE-29) be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Monday, November 07, 2011.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE